UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| CARLYLE PHILLIP, | ) |
| | ) Civil Action No. 04-11896-MLW |
| Petitioner, | ) |
| | ) |
| v. | ) |
| | ) |
| THOMAS M. HODGSON, SHERIFF, | ) |
| | ) |
| Respondent. | ) |

RESPONSE OF BUREAU OF IMMIGRATION AND CUSTOMS
ENFORCEMENT TO THE COURT'S ORDER DATED SEPTEMBER 16, 2005

I. INTRODUCTION

The Department of Homeland Security, Bureau of Immigration and Customs Enforcement ("ICE"), submits this response to the Court's Order dated September 16, 2005, directing the government to explain the circumstances surrounding the Petitioner's removal. The Petitioner was removed to Trinidad on April 7, 2005, without giving the Court advance notice as required by a prior order of the court. As explained below, the failure to provide advance notice was unintentional and inadvertent and not the result of any willful conduct. Moreover, significant changes are being implemented to the ICE system for ensuring compliance, such that the risk of future noncompliance should be eliminated to the extent feasible.

The government submits herewith Declarations of Bruce Chadbourne, Field Office Director of the Boston ICE Office of Detention and Removal ("DRO"),[1] and Frank Crowley, Special Assistant U.S. Attorney and an attorney in the ICE Office of Chief Counsel ("OCC"). These declarations provide information responsive to the matters on which this Court directed the government to report in the Court's September 16, 2005, Order.[2] In this memorandum, the government first provides background information regarding the pertinent operations of the Boston ICE, then it responds directly to questions given in the September 16, 2005, Order, and then the government provides argument that no contempt sanction is appropriate.

## II.    STATEMENT OF FACTS

A.    Removal Procedures

The ICE Boston office of the DRO, headed by Field Office Director Bruce Chadbourne, is responsible for the enforcement of final administrative orders for the removal of aliens pursuant to the Immigration and Nationality Act. Declaration of Bruce

---

[1] Effective March 1, 2003, the Immigration and Naturalization Service was abolished, the Department of Homeland Security ("DHS") was established, and most of the interior enforcement functions of the former INS, including the enforcement of removal orders, were transferred to the DHS Directorate of Border and Transportation Security, Bureau of Immigration and Customs Enforcement. Homeland Security Act of 2002, § 471, Pub. L. 107-296, tit. IV, subtits. D, E, F, 116 Stat. 2135, 2192 (Nov. 25, 2002). For convenience, references to "DHS," "ICE," and "DRO" herein include the predecessor organizational units that exercised the same functions within the INS prior to its abolition.

[2] The undersigned Assistant U.S. Attorney has been unable to obtain declarations from Immigration and Enforcement Agent Brian Churchill, ICE DRO, or from Acting Chief Immigration Enforcement Agent James Brown, ICE DRO.

Chadbourne ("Chadbourne Dec.") ¶ 1.  In general, the Boston ICE DRO office enforces removal orders issued by the Boston office of ICE, which generally covers removals initiated in Massachusetts, Maine, New Hampshire, Rhode Island and Vermont.[3]  Id. ¶ .

When the DRO receives a final administrative removal order, and provided there is no impediment to removal, a DRO agent will obtain official travel documents from the foreign government, flight itineraries through a government ticketing program, travel authorizations from ICE Headquarters, and appropriate country clearances.  Id. ¶¶ 8-9.  Once the travel arrangements are finalized and a specific date for the alien's removal is established, the DRO agent will send out two notices of the scheduled removal.  One is sent to the State Department through ICE Headquarters in Washington, D.C.  Id.  Upon confirmation of travel itinerary and clearances, a separate e-mail notice is sent to various agents and employees of the Boston ICE Investigations ("OI") as well as persons in DRO and OCC.  This second notice is normally sent at least 10 business days in advance of the removal.  Id. ¶ 9.  Sometimes a single e-mail notice will cover two or more aliens.  Roughly 500-700 such e-mail notices are sent out each year to the ICE Boston OCC.  Id. [4]  Sometimes a notice will cover two or more aliens.  The final step of the removal process

---

[3] In FY 2005 the Boston DRO carried out approximately 1,850 removals, and in 2004 approximately 2,250 removals.  The number of removals has increased significantly since 1990, when approximately 300 aliens were removed by Boston DRO.  Chadbourne Dec. ¶¶ 6, 7.

[4] Some removals can be effectuated promptly, i.e., within a few weeks.  Often, however, a removal will take considerably longer to carry out due to a variety of circumstances.  See Chadbourne Dec. ¶ 7.

is the "out-processing," when the alien's identity is verified, a computer check is made for outstanding warrants, any held personal property is returned to the alien, and travel documentation is checked over. Id. ¶ 10. The alien is then taken to the airport and escorted to the receiving country.

B.    General Procedures for Notification of Court

Since 1990, Frank Crowley, an attorney within the DHS ICE Office of the Chief Counsel ("OCC") and a Special Assistant United States Attorney for immigration matters within the District of Massachusetts, has generally shouldered responsibility for notifying district courts within the district of scheduled deportations when the enforceability of the deportation orders are the subject of pending litigation. Declaration of Frank Crowley ("Crowley Dec.") ¶¶ 1-2.[5]

Before about mid-2003, Mr. Crowley fulfilled his responsibility regarding prior notice by sending an e-mail notice to the Supervisory Detention and Deportation Officer in the DRO and certain other ICE officers of pending court actions, instructing that Mr. Crowley was to be given five days advance oral notice of any scheduled deportation.

---

[5] As a matter of administrative policy, the government provides advance notice to the court of a scheduled deportation when it is aware of a habeas corpus petition challenging the enforceability of a deportation order, regardless of whether a court order requires the notice. This administrative policy is independent of and supplementary to orders such as the one at issue in this case. Cf. Fuller v. INS, 144 F.Supp.2d 72 (D. Conn. 2000) (similar practice not followed where INS not served; court finding habeas corpus jurisdiction not thereby impaired despite actual deportation). The policy calls for at least 48 hours (two business days) notice of scheduled removal, when possible, or shorter notice when circumstances make 48 hours notice impossible. A court order for a greater notice period or for a stay would supersede any administrative practice.

Upon receiving notice of a scheduled deportation, Mr. Crowley would provide appropriate notice to the court. Crowley Dec. ¶¶ 3-9. This practice worked well from 1990 (when Mr. Crowley became a Special Assistant U.S. Attorney for the former United States Immigration and Naturalization Service) until April 2003, when an alien was inadvertently deported in violation of a prior notification requirement in a case then pending before District Judge Ponsor, Gordon v. Ashcroft, Civil Action No. 02-30199-MAP. It was determined that the cause of the failure was a change in personnel responsible for scheduling aliens for removal and their lack of awareness of the requirement and practice for giving advance notice to Mr. Crowley.

In response to the April 2003 incident, Mr. Crowley and other agency employees undertook to improve the system for ensuring that aliens were not removed in violation of court orders. Specifically, the agency developed a central database (called the "Stays Database") containing information on pending federal court restrictions on the enforceability of deportation, removal, and exclusion orders in individual cases. Crowley Dec. ¶ 10. The Stays Database was made accessible by certain personnel in the DRO so that a DRO agent making arrangements for the removal of an alien, as well as the responsible attorney in OCC, could check the database to determine whether there existed a pending court action and/or a restriction on the alien's removal. Id. ¶ 11. Mr. Crowley and others in OCC regularly update the Stays Database upon learning of a new federal court action or a new restriction on removal by entering into the database the alien's

5

identifying information and information regarding the case and restriction on removal. Id. ¶¶ 10-12.

A Users Guide for the Stays Database gives instructions on how to use the Database. See Attachment A to Crowley Dec. The user queries the database for a particular alien using a unique identification number. If the alien's name is not in the Database, a green window will appear with the words "NO RECORD FOUND." Id. This indicates that the alien's removal is not subject to a stay or advance notice requirement and that the alien may be processed for removal. If the alien's name *is* in the Database, a red window will appear that includes the words, "STAY IS IN EFFECT – DO NOT REMOVE" prominently displayed. This message appears both in those cases where an actual stay is in effect and in cases where there is not stay in effect but a requirement for advance notice to the court. Id. The red window also contains information regarding the pending case and the nature of the restriction. Where there is an advance notice requirement, the red window contains the following statement:

> THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS MUST BE PROVIDED 48 HOURS (TWO (2) FULL BUSINESS DAYS) ADVANCE NOTICE OF ANY SCHEDULED REMOVAL. IN ORDER TO COMPLY WITH THE COURT'S ORDER, NO REMOVAL MAY BE EFFECTED UNLESS SAUSA FRANK CROWLEY IS FIRST GIVEN FIVE (5) FULL BUSINESS DAYS ORAL NOTICE OF SCHEDULED REMOVAL (617) 565-2415. [Civil Action Number]

Id. ¶¶ 4, 15 and Attachments C and D thereto. In addition, SAUSA Crowley has continued his practice of sending an email notice whenever he becomes aware that a new

district court case has been filed. That email notice essentially duplicates the above-quoted statement given in the red window of the Stays Database. Crowley Dec. ¶ 16. When SAUSA Crowley is notified of a scheduled removal of an alien who has a pending case that is the subject of an advance notice requirement, Crowley notifies the court of the planned removal.

While the Stays Database system implies a routinized procedure for internal communications between OCC and DRO, in fact the method of communications regarding aliens is highly varied, due to the various circumstances attending particular cases. In some classes of cases the government counsel will take the initiative to contact the appropriate DRO Immigration Enforcement Agent to determine the status of removal, whereupon notice will be given to the district court if appropriate. Crowley Dec. ¶¶ 30, 33. In other types of cases the litigation will be resolved before the removal can be scheduled, which obviates the need for giving the court notice. Id. ¶¶ 31, 32.

### III. RESPONSE TO COURT'S SEPTEMBER 16, 2005, ORDER

A. What Efforts Were Made to Inform the Department of Homeland Security, Immigration and Customs Enforcement of the Notice Requirement of the September 1, 2004 Order?

On August 31, 2004, attorney Crowley sent an e-mail to the ICE DRO. Crowley Dec. ¶ 16-17. The email used Crowley's standard format and advised that a habeas corpus action had been filed in the United States District Court for Massachusetts by Carlyle Phillip. That e-mail further stated in part:

> THE UNITED STATES DISTRICT COURT FOR THE
> DISTRICT OF MASSACHUSETTS MUST BE **PROVIDED
> 48 HOURS (TWO (2) FULL BUSINESS DAYS)
> ADVANCE NOTICE** OF ANY SCHEDULED REMOVAL.
> IN ORDER TO COMPLY WITH THE COURT'S ORDER,
> NO REMOVAL MAY BE EFFECTED UNLESS SAUSA
> FRANK CROWLEY IS FIRST GIVEN **FIVE (5) FULL
> BUSINESS DAYS** ORAL NOTICE OF SCHEDULED
> REMOVAL (617- 565-2415).

Id. and Attachment E to Crowley Dec. (capital letters and bold as in original). Also on August 31, 2004, Mr. Crowley entered information in the Stays Database indicating that there was a restriction on the removal of Carlyle Phillip, and setting forth essentially identical language to that quoted above. Crowley Dec. ¶ 15, and Attachments C and D to Crowley Dec.

On November 23, 2004, Boston ICE Deportation Officer Timothy T. Stevens of the DRO sent two emails to SAUSA Crowley requesting the administrative file relating to Phillip, and requesting an update on the pending district court litigation and also inquiring whether there was any stay of removal in the case. Mr. Crowley responded to Officer Stevens by two separate e-mails stating that the district court case was still pending decision, and that there was requirement that prior notice be given to the court, as set out in the Stays Database, but that no stay was in effect. Crowley Dec. ¶ 18.

In late March 2005, Immigration and Enforcement Agent Brian Churchill received travel documents and notification that Carlyle Phillip was determined eligible for removal to Trinidad. Chadbourne Dec. ¶ 17. On March 26, 2005, Agent Churchill sent an email notice to 33 Boston ICE employees advising the recipients that Phillip and another alien

were scheduled for escorted removal to Trinidad on April 7, 2005. Id. ¶ 17; Crowley Dec. ¶ 21. The email notice was sent to several attorneys in the OCC, including SAUSA Frank Crowley. Agent Churchill believed his March 26, 2005, email notice was sufficient to alert SAUSA Crowley to the scheduled removal. Chadbourne Dec. ¶ 15.

SAUSA Crowley did not receive oral notification of the scheduled removal. He did receive Churchill's March 26, 2005, email. Crowley Dec. ¶ 24. However, the email did not alert the reader to the existence of a pending case, and it was but one of roughly 500 to 700 similar email notices (covering over 2,000 aliens) that Mr. Crowley receives each year, most of which do not relate to aliens with pending district court cases. Crowley Dec. ¶¶ 21. For these reasons, Mr. Crowley did not recognize the email as pertaining to an alien with a pending district court action with a prior notice requirement. Id. ¶ 24. Accordingly, he did not report the scheduled removal to the Court.

B.      Who Were the Official(s) Responsible for Phillip's Deportation?

No single person was responsible for Phillip's removal. Since April 2004, Bruce Chadbourne has been the Field Office Director for Deportation and Removal Operations at the Boston office of the Bureau of Immigration and Customs Enforcement, Department of Homeland Security, and his responsibilities include the enforcement of final administrative orders for the removal of aliens such as Phillip. Chadbourne Dec. ¶ 1. Accordingly, Mr. Chadbourne had ultimate responsibility for the removal, except for the period from approximately late March through April 8, 2005, when Mr. Chadbourne was on detail on an assignment in Washington, D.C. Chadbourne Dec. ¶ 2. During that time

the Acting Field Office Director was James Martin, who was also the Acting Deputy Field Office Director of the DRO.  Id.  Neither Mr. Chadbourne nor Mr. Martin had any specific involvement in Phillip's removal.  Id. ¶ 3.

Initial steps to effect the removal of Mr. Phillip were taken in late November and December 2004 when Boston ICE Deportation Officer Timothy T. Stevens of the DRO conducted a Post Order Custody Review.  Chadbourne Dec. ¶ 17.  Officer Stevens sent e-mails to Frank Crowley requesting the administrative file relating to Carlyle Phillip, and also inquiring whether there was any stay of removal in the case.  Id.  Mr. Crowley responded that the district court case was still pending and that there was a requirement for prior notification, but that there was no stay in effect.  Id.; and Crowley Dec. ¶ 18.  Final clearance for Phillip's removal was given by James Brown, Acting Chief Immigration Enforcement Agent, DRO.  Crowley Dec. ¶ 20.  Final travel arrangements for Mr. Phillip were made by Immigration and Enforcement Agent Brian Churchill of the DRO, and Agent Churchill gave email notice to the Office of Chief Counsel regarding the schedule removal.  Chadbourne Dec. ¶ 18; Crowley Dec. ¶ 22.  Deportation Officer Craig Galluzzo and Immigration and Enforcement Agent Michael Naughton escorted Mr. Phillip to Logan Airport and thence to Trinidad on April 7, 2005.  Chadbourne Dec. ¶ 4.

C.    Why Was the Required Notice to the Court Not Given?

The required notice was not given because of an inadvertent failure of communication between the DRO and SAUSA Crowley.  On the one hand, Crowley's August 31, 2004, email and the notice in the Stays Database called for oral notice, and

Crowley expected oral notice. From Crowley's perspective, his expectation of oral notice was reasonable given the large number of email notices issued each year, the even larger number of aliens removed, and the significant number of pending cases in the Stays Database. See Crowley Dec. ¶¶ 4-27. On the other hand, the DRO was not unreasonable in thinking that email notice was sufficient. The word "oral" in Crowley's August 31, 2004, email notice and on the Stays Database screen was not in bold font; the DRO had an established email notification procedure; and the potential inadequacy of email notice had not previously been an issue to the DRO. From the DRO's perspective, it was reasonable to conclude that email was a reliable method of giving notice, particularly when numerous people need to be notified. Chadbourne Dec. ¶¶ 13-16. Attorney Crowley aptly summarizes the problem as follows:

> Because of the variety of factual and legal contexts in which immigration habeas corpus cases arose in my practice . . . and the fact that I myself would often initiate the dialogue for ascertaining the scheduled removal date for a habeas litigant, it appears that Detention and Removal officers considered routine e-mail traffic to be sufficient notice, while I was expecting oral notice, and that this disconnect did not come to light before the instant violation of the Court's order illustrated the problem.

Crowley Dec. ¶ 29. The failure to provide notice was thus an honest, albeit unfortunate, mistake.

D.  Have Other Orders Requiring Notice to the District Court for the District of Massachusetts Prior to Deportation Been Violated, and, If So, When and In Which Case(s)?

The Civil Division of the U.S. Attorney's Office for this District and the Boston ICE are aware of only one other instance in which a removal was effected in violation of a prior notice requirement in the District of Massachusetts.  The removal occurred on April 7, 2003, in the case <u>Gordon v. Ashcroft</u>, Civil Action No. 02-30199-MAP.  The government believes the removals in <u>Gordon</u> and the instant case are the only violations that have occurred in the 15 years since 1990 (1990 is the limit of the government's institutional knowledge).[6]

E.  What Steps, If Any, Have Already Been Taken to Assure That Such Orders Are Not Violated In the Future; and What Additional Steps, If Any, Will Be Taken to Assure That Such Orders Are Not Violated In the Future?

When Mr. Crowley and the DRO realized that Mr. Phillip had been deported in violation of the Court's prior notification order in this case, discussions were undertaken between the DRO and OCC on ways to improve the Boston ICE's internal notification procedures.  A meeting was held on September 27, 2005, at the offices of the United States Attorney, District of Massachusetts.  The attendees included OCC Deputy Chief Counsel Cornelius Cashman; SAUSA and OCC attorney Frank Crowley; DRO Field Office Director Bruce Chadbourne; Boston ICE Chief Immigration Enforcement Agent James E. Brown, Jr.; Supervisory Detention and Deportation Officer John Lawler;

---

[6] The government does not have any means to realistically search records for this information.  Therefore it must rely on the memories of current employees.

Assistant U.S. Attorney Mark Grady; and Assistant U.S. Attorney George B. Henderson, Deputy Chief of the Civil Division. Chadbourne Dec. ¶ 23.

At the meeting, the DRO and OCC agreed to implement certain changes to the Stays Database and the internal notification procedures in order to guarantee, to the extent possible, that future violations of court orders will not occur. Specifically, the Stays Database will be modified to create a new field to allow the OCC to affirmatively indicate that OCC has given litigation clearance for the removal of an alien in those cases requiring notice to the United States District Court or affected by other restrictions. Id. ¶ 25.

Where notice to a district court or other restriction must be complied with as a pre-condition of removal, the DRO will communicate to the OCC its desire to execute a removal order once the precondition has been satisfied, and the DRO and OCC will work together to ensure that advance notice of a scheduled removal is given to the district court, or to satisfy any other legal restriction. Once any legal pre-conditions for removal have been satisfied, the OCC will affirmatively update the Stays Database so as to allow the DRO to query and print from the Stays Database a record that will indicate substantially as follows:

> LITIGATION CLEARANCE FOR REMOVAL ON [DATE] APPROVED BY BOSTON OFFICE OF THE CHIEF COUNSEL. YOU MUST CONTINUE TO RE-CHECK FOR VALID CLEARANCE UP UNTIL AS SOON AS PRACTICABLE PRIOR TO EXECUTION OF THE REMOVAL ORDER.

In all cases, the DRO will not execute any removal order unless, as part of the alien's out-processing procedure, and as soon as practicable before the alien's removal, the DRO queries the Stays Database and prints out from the Stays Database and places prominently in the alien's administrative Alien File either of two records: (1) a Record of No Stays/Restriction, indicating that there is no record of a stay or restriction in the Stays Database; or (2) a record of OCC Litigation Clearance Approval, as described above, in the case of an alien with a stay or other restriction.[7] Id. ¶¶ 26-28.

The protocol of checking the Stays Database and placing in the A-file either a "No Record" printout or a "Litigation Clearance Approval" printout as described above will apply to all cases managed by the Boston DRO Field Office, regardless of whether removal is scheduled to be executed directly from Massachusetts or from any other place in the United States, and regardless of whether the alien has any pending United States District Court case. Id. ¶ 29.

The Boston ICE is now in the process of modifying the Stays Database to incorporate these changes. Boston ICE personnel will be trained in the new procedures. The DRO and OCC will monitor the newly implemented Stays Database changes to ensure its successful operation. Id. ¶ 30. In addition, the Boston ICE and the Civil Division of the U.S. Attorney's Office for the District of Massachusetts will be evaluating

---

[7] The DRO and OCC have determined that the Stays Database should be checked close in time to the actual removal because a previous printout of No Record or of OCC Litigation Clearance Approval may be superseded by the filing of a court action or by subsequent court orders or other developments.

notification procedures used in certain other regions of the country to determine whether other practices could even further improve reliability.  Also, the U.S. Attorney's Office is evaluating its own role in ensuring proper notice to the courts, as more direct case management responsibility shifts to that office.  All of these efforts should ensure, to the extent reasonably possible, that future errors do not occur.

IV. REASONS WHY CONTEMPT SANCTIONS ARE NOT APPROPRIATE

The government recognizes that the Court's Order of September 1, 2004, was violated.  However, neither civil nor criminal contempt sanctions are appropriate given the particular circumstances of this case.

Civil contempt does not appear appropriate.  The purpose of civil contempt is remedial, and its principal objective is to coerce compliance.  See McComb v. Jacksonville Paper Co., 336 U.S. 187, 191 (1949); United States v. Marquardo, 149 F.3d 36, 39 (1st Cir. 1998).  As this Court observed at the hearing on October 5, 2005, in this case it is now impossible to comply with the requirement that the government give advance notice of Phillip's removal.  Unfortunately, what is done is done.  In addition, although the government has offered to attempt to return Mr. Phillip to the United States at no expense to him, this does not appear practicable at this time.  And, most importantly, the Boston ICE has taken appropriate steps to prevent future violations by implementing detailed procedures that, to the extent reasonably possible, should eliminate the risk of future noncompliance.  To require more than has already been done would likely be counterproductive.

To the extent civil contempt would impose a monetary penalty on the government, it is barred by sovereign immunity. United States v. Horn, 29 F.3d 754 (1st Cir. 1994). Moreover, the facts of this case do not support such a sanction. Blame for the violation of the court order lies with an internal agency notification system that did not work perfectly in this case because of innocent and understandable misunderstandings regarding the sufficiency of e-mail notice. The problem is now being fixed. Under such circumstances, a civil contempt sanction would not achieve any remedial purpose and would be unwarranted. See also United States v. Starusko, 729 F.2d 256, 264 (3d Cir. 1984) (noting doubts about whether the government was subject to contempt sanctions).

Criminal contempt is unavailable here. The Petitioner's removal from the United States without compliance with the Court's advance notice order was not "willful" or in conscious defiance of the Court's order. United States v. Michaud, 928 F.2d 13, 15 (1st Cir. 1991). "The requirement of willfulness contemplates knowledge that one is violating a court order." United States v. Mourad, 289 F.3d 174, 180 (1st Cir. 2002); United States v. Marquardo, 149 F.3d 36, 43 n.4 (1st Cir. 1998) (same). The declarations submitted by the government show that it was not until September 2005 that ICE officials even realized that the Court's September 1, 2004, Order had been violated. The declarations show that at no time did any ICE official harbor any intent to violate the Court Order, and at no time before September 2005 did any individual at ICE think that his preferred method of communication might result in such a violation. Chadbourne Dec. ¶ 21-22, 32; Crowley Dec. ¶¶ 24-25. Even if in hindsight one might conclude that

the OCC and/or DRO should have realized the potential for miscommunication, this is plainly insufficient to form the basis for a finding of criminal contempt.[8]

In sum, the removal of Petitioner from the United States without compliance with the Court's advance notice requirement was a result of a misunderstanding regarding the method of internal communication between two offices of the ICE. There is no evidence to suggest that the violation was conscious, knowing or willful, and there is no need for coercive measures to bring about future compliance. Therefore, neither civil nor criminal remedies are warranted.

## CONCLUSION

The government sincerely regrets that it did not comply with the prior notification requirement of the Court's September 1, 2005, Order. However, this was a result of mistake or inadvertence, and the government is implementing significant improvements

---

[8] It is doubtful that criminal contempt could be imposed against the "government, qua government." United States v. Starusko, 729 F.2d 256, 263 (3d Cir. 1984).

to its internal notification procedures to remedy the problem.  For these reasons, the Court should not impose any sanction upon the government or any of its employees.

                                                  Respectfully submitted,

                                                  MICHAEL J. SULLIVAN
                                                  United States Attorney

                             By:    /s/ George B. Henderson, II
                                      George B. Henderson, II
                                      Assistant U.S. Attorney
                                      John Joseph Moakley U.S. Courthouse
                                      1 Courthouse Way, Suite 9200
                                      Boston, MA 02210
                                      (617) 748-3272

Dated: October 20, 2005