UNITED STATES UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **CARLYLE PHILLIP,** ) | |
| ) | **Civil Action No. 04-11896-MLW** |
| **Petitioner,** ) | |
| ) | |
| **v.** ) | |
| ) | |
| **THOMAS M. HODGSON, SHERIFF,** ) | |
| ) | |
| **Respondent.** ) | |

**DECLARATION OF BRUCE CHADBOURNE**

I, Bruce Chadbourne, do hereby declare as follows:

1.  I am presently employed as the Field Office Director for Deportation and Removal Operations ("DRO"), Department of Homeland Security, United States Immigration and Customs Enforcement ("ICE"), Department of Homeland Security, in Boston, Massachusetts. I have held this position since April 2004. I was the Acting Field Office Director for DRO from approximately May 2003 to April 2004. Among my responsibilities are the enforcement of final administrative orders for the removal of aliens pursuant to the Immigration and Nationality Act.

2.  The purpose of this Declaration is to respond to the Court's September 16, 2005, Order insofar as it concerns the erroneous removal of the petitioner Carlyle Phillip on April 7, 2005. I make this declaration in part based on my personal knowledge, and in part based on my review of agency records and discussions with DRO employees under my supervision. During late March 2005 through April 8, 2005, I was absent from the Boston ICE field office because I was on a detail to ICE Headquarters in Washington, D.C. The Acting Field Office Director during the time I was in Washington, D.C., including the time Mr. Phillip was removed, was James Martin, who was also the Acting Deputy Field Office Director of the DRO.

3.      On February 4, 2004, the ICE issued to Carlyle Phillip a Final Administrative Removal Order under Section 238(b) of the Immigration and Nationality Act, 8 U.S.C. § 1228(b).  The DRO was responsible for carrying out the removal of Mr. Phillip.  Neither Mr. Martin nor I had any direct involvement in Mr. Phillips' removal, and neither of us recalls any specific indirect involvement.  However, as a result of Mr. Philip's removal prior to providing advance notice to the Court, I, as the Field Office Director, have had numerous discussions with my subordinates and with personnel in the Immigration and Customs Enforcement Office of Chief Counsel ("OCC") in order to determine the cause of the error and to help fashion a solution to prevent another such error from occurring.

4.      Immigration Enforcement Agent ("IEA" or "Agent") Brian Churchill of the DRO made the final travel arrangements for the removal of Mr. Phillip. Agent Churchill also sent an e-mail notice to various persons, as described in more detail in paragraph ten (10) below.  Agent Churchill's direct supervisor, James Brown, Acting Chief Immigration Enforcement Agent, approved the travel arrangements and removal.  Deportation Officer Craig Galluzzo and Immigration Enforcement Agent Michael Naughton took Mr. Phillip to Logan Airport and escorted him to Trinidad and Tobago on April 7, 2005.

5.      The reason Mr. Phillip was inadvertently removed prior to receiving approval by the Court was because of an inadvertent miscommunication between the DRO and the OCC.  The reasons for the miscommunication and the steps being taken to improve communications between the DRO and the OCC are described in more detail below.  In order to provide context, I will first give a background description of our normal procedures for removing aliens.

6.      The Boston DRO enforces removal orders issued by the Boston ICE, which is responsible for removals initiated in Massachusetts, Maine, New Hampshire, Rhode Island and

Vermont. In fiscal year 2005, the ICE Boston office removed roughly 1850 aliens, with an additional 1000 aliens being removed from the other office under my command, ICE Hartford. Since I have worked in the Boston Office, I have been aware of only two occasions, of the thousands handled by ICE, when an alien was deported or removed prior to receiving final approval from the Court. One was in 2003, in the case of <u>Gordon v. Ashcroft</u>. The other was in this case.

      7.      The number of removals carried out by the Boston DRO has grown dramatically from approximately 300 in 1990 to over 2,250 in 2004. The timing of alien removals varies widely because of case-specific circumstances. A small percentage of aliens can be removed fairly promptly, for example, within a month or so, after the entry of a final order of removal. Other aliens cannot be removed for many months or even years after the date of the removal order due to a variety of circumstances, including administrative and judicial appeals, delay or even refusal of the foreign country to issue travel documents, or completion of a pending criminal sentence.

      8.      Once an alien is designated for removal, and provided no judicial stay of removal is in place, a DRO agent will obtain an Official Travel Document from the foreign government and flight itineraries via the Government Centralized Ticketing program, Travel Authorizations from ICE Headquarters and appropriate country clearances via the Removal and Escort Country Clearance ('RECC') system.

      9.      Once the travel arrangements are finalized and a specific date for the alien's removal is established, the DRO agent will send out two notices advising the addressees of the scheduled removal. One notice is the RECC notice, which the State Department receives, through ICE Headquarters in Washington, D.C. The other notice is an e-mail notice that is sent

upon confirmation of travel itinerary and clearances to various agents and employees of the Boston ICE Investigations ("OI") as well as persons in DRO and OCC. ICE Headquarters requests 10 business days or 14 calendar days notice per the RECC guidelines, although waivers of these time constraints are sometimes granted and clearances given. Sometimes a single e-mail notice will cover two or more aliens. I estimate that roughly 500-700 such e-mail notices are sent out each year to the ICE Boston OCC. The e-mail notice sent on March 26, 2005, regarding Mr. Phillips and another alien is typical of this type of notice.

10. Mr. Philips was "out-processed" for removal on April 7, 2005, in the same manner as the out-processing is handled in every removal. Out processing involves checking computer indices for any outstanding criminal warrants, reviewing and verifying the alien's identity, taking a fingerprint from the alien and comparing it against that which appears on the G-385 card, returning all receipted property and valuables to the alien, electronic notice of the victim-witness warning request is made, and completing a review of the travel documents and tickets.

11. In 2003 the OCC developed a "Stays Database" to be used by certain individuals in DRO and OCC to identify those aliens who have a pending case in federal court and to determine whether there is in effect a stay of removal or a requirement that notice be given to the court prior to removal. The Stays Database was developed by OCC because of the Gordon case when an alien was deported in violation of a United States District Court order requiring advance notice of the removal. The Stays Database was specifically implemented to prevent the premature removal of any alien and to avoid a repeat of the Gordon case.

12. At the time of Mr. Phillip's removal, a limited number of DRO employees had access to the Stays Database. (Neither I nor Acting Deputy Field Office Director James Martin had access.) It was the general practice of the Boston ICE that the DRO Immigration

Enforcement Agents responsible for making travel arrangements would check the Stays Database to see whether there was a pending court case. If there were none, the Agent would continue to process the alien for removal. If the check of the Stays Database indicated a stay was in place, the removal would be halted and no further processing of the alien's removal would take place until notice was received from OCC that the stay was lifted.

13.     If the check of the Stays Database indicated that no stay was in place but that an advance notification requirement was in effect, the Immigration Enforcement Agents would continue to process the alien for removal and would give notice to the OCC, among others, normally at least 10 business days in advance of the scheduled removal date. It was the understanding of the DRO that e-mail notification was sufficient for purposes of giving prior notice to the OCC of an alien's removal, and it is my understanding that in practice this was the method of notice given in every case for the past three years. Of course, oral communications between the DRO and OCC also occurred, as Mr. Crowley at times initiated conversations about an alien due to the particular circumstances of a case.

14.     In addition, if an alien filed an action in federal United States District Court, it was the practice of attorney Frank Crowley to send DRO personnel a form e-mail notice advising the DRO of the existence of the pending case, whether a judicial stay or advance notice requirement was in effect, and requesting at least five days advance "oral" notice of the removal. Mr. Crowley's notice followed a standard format, and, until the erroneous removal of Mr. Phillip came to our attention in September of this year, personnel in the DRO did not notice the request for <u>oral</u> notice, because, from the DRO's perspective, e-mail notice was the DRO's standard practice and seemed at least, if not more, reliable than "oral" notice. Moreover, it was this written e-mail notice that was provided to the OCC in every removal case during the past three years.

15. I recall that when the Stays Database was created, there were discussions between DRO and OCC about the Database and how to use it. However, to my knowledge, the issue of oral notice versus e-mail notice was never discussed and never became an issue, at least until September of this year. As best I can determine, the reason this never became an issue is that frequently, when a new United States District Court case is filed, either an emergency request for a stay will cause Mr. Crowley from OCC to contact the DRO to ensure that removal efforts are halted, or else the litigation is resolved before all of the removal arrangements are completed.

16. In the case of Mr. Phillip, as indicated above, ICE issued a final administrative order of removal on February 4, 2004. On August 31, 2004, attorney Frank Crowley sent an e-mail notice to thirty-one (31) relevant employees in the DRO advising the DRO of the United States District Court action filed by Mr. Phillip and stating that prior notice to Mr. Crowley was necessary before a removal was to be effected. The e-mail followed a standard format used by Mr. Crowley for giving such notices. Although Mr. Crowley's e-mail stated that "oral" notice was to be given, my staff at DRO advise me they did not notice it, and furthermore, believed e-mail notification to OCC fulfilled the notification requirement. It was not until Mr. Phillip's case that an issue arose.

17. Initial steps to arrange for the removal of Mr. Phillip were taken in December 9, 2004. On November 23, 2004, Boston ICE Deportation Officer Timothy T. Stevens sent e-mails to Frank Crowley requesting the administrative file relating to Carlyle Phillip, to conduct a Post Order Custody Review ("POCR"), and also inquiring whether there was any stay of removal in the case. Mr. Crowley responded that the United States District Court case was still pending and that there was a requirement for prior notification, but that there was no stay in effect.

18.     On March 24 or 25, 2005, Agent Churchill received travel documents and notification that Carlyle Phillip was determined eligible for removal pending RECC approval. On Saturday, March 26, 2005, DRO Agent Churchill sent an e-mail notice to a group of thirty-three (33) ICE employees, including SAUSA Frank Crowley, indicating that two aliens, one of whom was Mr. Phillip, were scheduled for removal to Trinidad and Tobago on April 7, 2005. This form of notice was identical to the notice DRO gives to the OCC with respect to any alien scheduled for removal, including aliens subject to a prior notification requirement in a pending United States District Court case. As stated above, this e-mail notification to OCC is generated upon confirmation of the travel arrangements, which includes the RECC notice.

19.     The DRO did not receive any information from OCC regarding a stay or any other basis for delaying the removal of Mr. Phillip and therefore concluded that, in accordance with the DRO's customary practice, the necessary internal notification had been given. Mr. Phillip was subsequently removed on April 7, 2005.

20.     Although the DRO provided e-mail notification to Mr. Crowley regarding the scheduled removal of Mr. Philip, I have no information to suggest that failure to provide the Court with the required notice was anything other than a wholly unintentional and innocent omission. It would appear that the miscommunication arose from the failure to see the potential for a problem, due to the fact that United States District Court habeas cases, and the circumstances of communications between the DRO and OCC, differ widely from case to case, depending on a variety of unique circumstances.

21.     It was not until after the Court's September 16, 2005, Order that I and other DRO personnel learned that the Court's advance notification Order in this case had been violated. Certainly, neither I, nor (to the best of my knowledge) anybody else in the DRO harbored any

intent to violate the Court's Order. Mr. Phillips was not removed to violate the Court's order, nor for anything relating to Mr. Phillips underlying case or for any reason relating to Mr. Phillips personally. He was simply removed because of an unintentional and innocent miscommunication between the DRO and OCC.

22.    I personally have no specific recollection of ever having heard of Mr. Phillip, nor of ever speaking to anyone within the DRO or the OCC about Mr. Phillip prior to the Court's September 16, 2005 order. I was completely unaware that there had been a violation of the Court's Order requiring prior notification for removal until September 2005. Furthermore, before we learned about the violation, neither I, nor anyone else in DRO (to my knowledge), had any awareness that our practices and methods of communicating with Mr. Crowley might result in a violation of the Court's Order. To the contrary, we believed that our practices and procedures would result in full compliance with all notification requirements in pending United States District Court cases. To my knowledge, there was no deviation from the standard notification by the DRO and Mr. Phillip's removal was handled in the same manner as every case. The violation in this case was the result of an unintentional miscommunication.

23.    Upon learning that Mr. Phillip had been deported in violation of the Court's prior notification order in this case, discussions were undertaken within ICE, between the DRO and OCC personnel regarding ways to improve our internal notification system to ensure that United States District Courts are always given prior notice of an alien's scheduled removal. On September 27, 2005, a meeting was held at the offices of the United States Attorney, District of Massachusetts. The attendees were myself; Boston ICE Chief Immigration Enforcement Agent James E. Brown, Jr.; Supervisory Detention and Deportation Officer John Lawler; Deputy Chief Counsel Cornelius Cashman; and attorney Frank Crowley, of the Office of Chief Counsel; as

well as Assistant U.S. Attorney Mark Grady and Assistant U.S. Attorney George B. Henderson, II, Deputy Chief of the Civil Division. At the meeting it was agreed that the Stays Database is fundamentally a good system, but that there should be established a clear and improved protocol for internal communications between DRO and OCC. The following describes our agreement.

24. The Boston Office of the ICE OCC will continue to enter into the Stays Database records of stays and restrictions relating to United States United States District Court actions, as these become known to the OCC. This will include records of affirmative stays granted by a United States United States District Court, and also any other restrictions affecting removal, including orders that a United States United States District Court be provided a certain period of advance notice of a scheduled removal.

25. The Stays Database is presently being modified to create a new field to allow the OCC to affirmatively indicate that OCC has given litigation clearance for the removal of an alien in those cases requiring notice to the United States United States District Court or affected by other restrictions.

26. In those cases where notice to the United States United States District Court or other restriction must be complied with as a pre-condition of removal, the DRO will communicate to OCC its desire to execute a removal order once the precondition has been satisfied, and DRO and OCC will work together to ensure that accurate notice of a scheduled removal is given to the United States United States District Court, or that any other restriction condition is satisfied. The OCC will affirmatively reply in writing to all written notifications by the DRO and thus only upon receipt of the written clearance by the OCC will the DRO proceed with the scheduled removal.

27. Once all known necessary legal pre-conditions for removal have been satisfied with respect to a case in the Stays Database, the OCC will affirmatively update the Stays Database so as to allow the DRO to query and print from the Stays Database a record that will indicate substantially as follows:

> **LITIGATION CLEARANCE FOR REMOVAL ON   [DATE] APPROVED BY BOSTON OFFICE OF THE CHIEF COUNSEL.  YOU MUST CONTINUE TO RE-CHECK FOR VALID CLEARANCE AS SOON IN TIME AS PRACTICABLE BEFORE ACTUAL REMOVAL.**

28. In all cases, the DRO will not execute any removal order unless, as part of the alien's out-processing procedure, and as soon in time as practicable before the actual removal, the DRO agent queries the Stays Database and prints out from the Stays Database and places prominently in the alien's administrative Alien File ('A-File') either of two records: 1) a Record of No Stays/Restriction, indicating that there is no record of a stay or restriction in the Stays Database; or 2) a record of OCC Litigation Clearance Approval, as described above, in the case of an alien with a stay or other restriction.  We concluded that it is appropriate for the DRO to check the Stays Database against removals close in time to the actual removal because a previous printout of No Record or of OCC Litigation Clearance Approval could be superseded by the filing of a United States United States District Court action or by subsequent court orders or other developments.   This system is a second, important step put in place to protect against another alien being removed prematurely because of miscommunication.

29. The protocol of checking the Stays Database and placing in the A-file either a No Record printout or a Litigation Clearance Approval printout as described above will apply to all cases under docket control by the local Boston DRO Office (not including the local Hartford

10

DRO Office), regardless of whether removal is scheduled to be executed directly from Massachusetts or from any other place in the United States, and regardless of whether the alien has any pending United States United States District Court case.

30. Our Boston ICE Information Technology specialists are in the process of modifying the Stays Database to include the new features described above. Once the changes are finalized, the new protocol will be explained to all pertinent DRO and OCC personnel, and training will be conducted to ensure its proper use. The DRO and OCC have agreed to continue to monitor the new Stays Database changes and protocol, and work together to ensure its successful operation in order to minimize and hopefully eliminate any possibility of non-compliance with United States United States District Court orders and other restrictions.

31. I believe the steps described above will ensure, to the fullest extent reasonably possible, that aliens are not removed in violation of United States District Court orders.

32. It is my belief that all those involved in Mr. Phillip's case did all they could, under the system, as it existed at that time, to assure complete compliance with all United States District Court Orders and regulations. It is also my belief that at no time, did any ICE DRO or ICE OCC personnel associated with Mr. Phillip's case knowingly, intentionally or purposefully do anything to violate the Court's Order. It is my belief that the most recent improvements and modifications to the Stays Database will be implemented to provide additional protection to assure that no alien is improperly or prematurely removed from the United States. Finally, it is my belief and my own personal view that every member of ICE DRO and ICE OCC was working to the best of his/her ability to comply with all protocols, orders and regulations in place at the time of Mr. Phillip's removal.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on October 20, 2005

                                               /s/ Bruce Chadbourne  
                                               Bruce Chadbourne  
                                               Field Office Director for Deportation and Removal Operations  
                                               Department of Homeland Security  
                                               United States Immigration and Customs Enforcement